UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID G. NASSER,                    )
                                    )
            Plaintiff,              )
                                    )
    vs.                             )        Case No. 4:05CV696 CDP
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) for judicial review of the

Commissioner's final decision denying Plaintiff David G. Nasser's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§

401, et seq. Nasser claims that he has been disabled and unable to work since

September 7, 2001 due to debilitating pain in his left testicle, left hip, and left

buttock attributed to several hernias and a very large varicocele.[1] The

Administrative Law Judge, however, found that Nasser was not disabled. Because I

find that the decision denying benefits was supported by substantial evidence, I will

affirm the decision.

---

[1]A varicocele is defined as "a condition manifested by abnormal dilation of the veins of the
spermatic cord, caused by incompetency of valves in the internal spermatic vein and resulting in
downward reflux of blood into the spermatic cord veins when the patient assumes the upright
position." Stedman's Medical Dictionary 1688 (25th ed. 1990).

**Procedural History**

On February 28, 2003, Nasser filed an application for a Period of Disability and Disability Insurance Benefits pursuant to Title II of the Social Security Act, alleging that his disability began on September 7, 2001. Nasser claimed his disability consisted of constant pain in his left testicle, left side of his groin, left buttock, and lower back, as well as headaches. The application was denied administratively on April 18, 2003.[2] Nasser then requested and obtained a hearing before Administrative Law Judge Julian D. Cosentino. On March 23, 2004, the ALJ determined that Nasser was not disabled within the meaning of the Social Security Act. Nasser then filed a request for review with the Appeals Council of the Social Security Administration. The Appeals Council granted this request, vacated the ALJ's decision, and remanded the case to another Administrative Law Judge.

Pursuant to this remand order, Administrative Law Judge Myron D. Mills conducted a hearing on September 1, 2004. As he did in the hearing before ALJ Cosentino, Nasser appeared at this hearing and testified on his own behalf. On November 13, 2004, ALJ Mills determined that Nasser was not disabled within the

---

[2]Missouri is one of several test states participating in modifications of the disability determination procedures applicable to this case. See 20 C.F.R. §§ 404.906, 404.966, 416.1406, 416.1466 (2001). These modifications include the elimination of the reconsideration step and, in some cases, the Appeals Council review step in the administrative appeals process. See id. Therefore, plaintiff's appeal in this case proceeded directly from her initial denial to the ALJ level.

meaning of the Social Security Act.  The Appeals Council denied Nasser's request for review of this decision on March 19, 2005.  Thus, the decision of ALJ Mills stands as the final determination of the Commissioner.

## Evidence Before the Administrative Law Judge

Nasser was born on November 17, 1946, and was 57 years old at the time of ALJ Mills' decision.  He has completed at least sixteen years of education, and has master's degrees in business administration and data processing.  For the fifteen years preceding the alleged onset of Nasser's disability, he worked as a computer consultant and program analyst for a variety of employers.  All of these positions were sedentary, requiring Nasser to sit in a chair in front of a computer for the entire workday.

Nasser testified that he was discharged from his most recent computer programming job on September 7, 2001.  Although his employer, United Health Care, allegedly informed him that his termination was based on the fact that the employee he was hired to replace had returned, Nasser testified that he felt the real reason for his discharge was his inability to concentrate on the job due to pain.

This pain, claimed Nasser, had been present for years in and around his left hip.  He testified that in the years leading up to his September 7, 2001 termination and continuing through the time of his second hearing, the pain steadily became

worse. Nasser identified three sources of pain around his left hip: his left testicle, the area adjacent to his left testicle where several hernia operations were performed, and his left hip. According to Nasser, together these three sources of pain prevent him from sitting for long periods of time or maintaining the concentration that detailed computer programming requires. He testified that every six or eight minutes, he needs to stand up, transfer his weight to his right foot, or lie down until the pain subsides.

Generally, Nasser testified that he is able to perform most tasks, but not for prolonged periods of time. He claimed that he could still drive his car, but primarily takes short trips. Likewise, he testified that he does his own yard work, vacuuming, cooking, and cleaning, but only in short spurts. His hobbies include limited amounts of fishing and woodworking. He grocery shops for himself once a week, but can only stand in a check-out line for ten minutes before he has to move and sit down.

He did not report any problems with the dexterity of his hands or his grip, and he is able to use his home computer frequently to maintain correspondence with friends, participate in on-line discussion groups, and generally stay abreast of the developments in the field of computer programming.

At the time of his second hearing, Nasser testified that his primary doctor was Dr. Kevin A. Coleman, a pain management specialist. Nasser claimed that he sees

Dr. Coleman twice a year. Nasser testified that he had received a sacroiliac injection to relieve an attack of pain in his left hip four to five weeks before the second hearing. Although Nasser did not believe the injection helped very much, he did acknowledge that he had not experienced another attack since then.

He claimed that the pain in his left testicle has not abated, and that he was currently under the care of Dr. Robert Feit, a urologist. Nasser testified that Dr. Feit had mostly been making references of other doctors, and Nasser was uncertain as to what Dr. Feit's plan was for dealing with Nasser's persistent testicular pain.

Upon the filing of his initial application for disability benefits, Nasser was interviewed by Larry Schneider. After a face-to-face interview, Mr. Schneider reported that Nasser had difficulty with reading and seeing due to his glasses. Otherwise, however, no difficulties with sitting, standing, walking, or concentrating were reported. Overall, Mr. Schneider noted that Nasser appeared "alert, intelligent, pleasant, [and] cooperative."

A Physical Residual Functional Capacity Assessment was completed on April 17, 2003. A Social Security counselor reviewed Nasser's medical records, as well as his alleged symptoms of pain. The counselor concluded that Nasser could occasionally lift and/or carry twenty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk a total of six hours in an eight-hour workday, sit for

about six hours in an eight-hour workday, and was not restricted in his ability to push and/or pull. The counselor observed no communicative, manipulative, visual, or environmental limitations. The counselor concluded that Nasser's restrictions would not prevent him from returning to his past work as a computer programmer.

## Medical Records

The earliest recorded treatment that Nasser received for the pain in and around his left hip came in 1996, when he underwent a hernia repair on the left side of his groin. There is no record of any other treatment until December 11, 2001, when Nasser was treated by Dr. Perry K. Geistler for pain in his right foot. Dr. Geistler performed a right first metatarsophalangeal joint cheilectomy on Nasser's foot to remove an aggravating bone fragment. No complications were reported during the surgery, and Nasser's condition was listed as stable.

On March 27, 2002, Nasser met with Dr. Abraham S. Hawatmeh, a urologist at St. Anthony's Medical Center, to discuss the pain in his left hip region. Jason Ropp, an assistant to Dr. Hawatmeh, noted that a scrotal ultrasound revealed a grade four out of four varicocele on Nasser's left testicle. Ropp informed Nasser of surgical options. Nasser indicated that he wished to hold off on surgery until a later date.

Later that spring, Nasser saw Dr. Philip G. George, an orthopedic doctor, concerning pain in his lower back. During his initial examination of Nasser on April 25, 2002, Dr. George reported that Nasser could stand and walk about the room without difficulty, heel and toe walk on both sides, hop independently on both sides, and demonstrated no limp. Nasser's range of motion was noted as not significantly restricted. A neurological examination of Nasser's lower extremities was basically intact. Dr. George diagnosed Nasser's lower back pain as the product of degenerative lumbar disc disease. He further noted that Nasser "certainly is not symptomatic enough to take medications," and advised Nasser that his findings were mild, and were not expected to cause major difficulty in the future. Upon Nasser's request, Dr. George offered him some samples of Celebrex.

Nasser again saw Dr. George on May 8, 2002 with concerns about whether he should take the Celebrex samples. He had not begun to take them since his last visit. Dr. George noted that Nasser most likely had some degenerative changes in his neck, similar to those observed in the lumbar spine area. Dr. George assured Nasser "that exercises, anti-inflammatory medication, and time will suffice to relieve the symptoms in the majority of instances." If the symptoms persisted, Dr. George encouraged Nasser to go ahead and take the Celebrex samples.

In September, 2002, Nasser reported back to Dr. Hawatmeh with complaints of severe pain in the left inguinal area and scrotal area. Dr. Hawatmeh attributed the pain to recurrent inguinal hernia and his grade four out of four varicocele. Dr. Hawatmeh scheduled Nasser for a left inguinal hernia, left varicocele ligation, and a possible mesh repair.

Nasser underwent surgery on October 2, 2002. He was noted to be both ambulatory and cooperative. Dr. Hawatmeh completed a hernia repair by inserting an additional piece of mesh to cover the hole that had formed in the mesh that had been inserted during Nasser's 1996 hernia operation. Additionally, Dr. Hawatmeh performed a left varicocelectomy to repair Nasser's varicocele. Dr. Hawatmeh reported that Nasser tolerated the procedure well, and was sent to the recovery room in satisfactory condition.

On October 14, 2002, Dr. Hawatmeh examined Nasser and reported that he "looks fine" and that there were "no problems." Vicodin was prescribed. Dr. Hawatmeh noted that Nasser "wanted a lot of Vicodin because he is having 'a hell of a time' ambulating, even though he looks fine and is ambulating well." Nasser returned to Dr. Hawatmeh's office on December 9, 2002 complaining of pain and discomfort in his scrotum. Upon examination, Dr. Hawatmeh noted some veins in the scrotal bag, but no lumps or mass. He also recorded that the hernia was holding

very well. He planned to "follow him conservatively," and informed Nasser that the pain might not go away for a while. As a worst case scenario, Dr. Hawatmeh suggested that the left testicle might have to be removed. Nasser did not prefer that option.

In the summer of 2003, Nasser sought treatment from Dr. Kevin A. Coleman of Pain Management Services. During his initial examination on July 28, 2003, Nasser complained of throbbing and aching pain in his left testicle, left inguinal area, and left buttock. He stated that he was taking Tylenol and Advil on a daily basis, and Vicodin three to four times per week. Dr. Coleman's physical examination of Nasser revealed tenderness in the left testicle, especially in the area of the varicocele. Dr. Coleman noted no other neuropathic symptoms or mechanical hyperalgesia.[3] Dr. Coleman provided Nasser with some samples of Zonegran, refilled his Vicodin prescription, and encouraged Nasser to have a left general femoral nerve block. Nasser declined the nerve block, stating that he wanted to wait until he had time to research the procedure on the Internet.

On June 14, 2004, Nasser saw Dr. Robert M. Feit, a urologist, regarding chronic left groin and testicular discomfort. Dr. Feit stated that the pain appeared related to Nasser's large varicocele. There is no record of any treatment plan or

_____

[3]"Hyperalgesia" refers to "extreme sensitiveness to painful stimuli." Stedman's at 738.

medications that Dr. Feit may have prescribed.

Nasser was examined by Dr. Michael A. Smith, a surgeon, on July 9, 2004. Dr. Smith's examination revealed a "small, recurrent, reducible left inguinal hernia" as well as a "small umbilical hernia." Dr. Smith recommended that Nasser consider a repair of the recurrent inguinal hernia to determine whether the left groin pain is related to the hernia. Dr. Smith informed Nasser that such a repair could improve his pain significantly. There is no medical record indicating that Nasser underwent the recommended hernia repair.

On August 10, 2004, Nasser saw Dr. Charles A. Wetherington, a neurosurgeon. His chief complaint was listed as back pain which radiated into the left groin, testicle, left hip, left buttock, and posterior thigh, with occasional pain into the left calf. Dr. Wetherington believed the source of Nasser's pain to be a possible left sacroiliitis[4] and recommended that Nasser undergo a left SI joint injection. If this injection failed to afford Nasser any relief from the pain, Dr. Wetherington suggested a trial of lumbar epidural steroid injections. Additionally, Dr. Wetherington stated that Nasser may need further treatment for his hernia repair in order to relieve his left groin pain.

---

[4]"Sacroiliitis" is defined as "[i]nflammation of the sacroiliac joint," a joint located in the lower lumbar region of the spine. Stedman's at 1377.

In accordance with Dr. Wetherington's recommendation, Dr. Coleman gave Nasser a left sacroiliac joint injection on August 17, 2004. At this time, Dr. Coleman and Nasser again discussed the possibility of performing a genitofemoral nerve block to alleviate Nasser's left inguinal and testicular pain. There is no medical record indicating that Nasser underwent the suggested femoral nerve block.

Finally, Nasser alleges that he underwent a left varicocele embolization[5] in October, 2004. Although there is no medical record of this procedure, Nasser alleges that it was performed by a radiologist at Barnes/Jewish Hospital.

## Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion. Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, id., or

---

[5]An "embolization" refers to the "[t]herapeutic introduction of various substances into the circulation to occlude vessels, either to arrest or prevent hemorrhaging or to devitalize a structure or organ by occluding its blood supply." Stedman's at 501.

because the court would have decided the case differently. Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992). In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it." Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000) (quoting Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) the credibility findings made by the Administrative Law Judge;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and non-exertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon a proper hypothetical question.

Brand v. Secretary of Dep't of Health, Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

The claimant bears the burden of proving his disability through step four. Snead v. Barnhart, 360 F.3d 834, 836 (8th Cir. 2004). "Only when the claimant establishes the inability to do past relevant work does the burden of proof then shift to the Commissioner. The Commissioner must then prove, first that the claimant retains the [residual functional capacity] to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) (citation omitted).

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. See e.g., Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by Polaski v. Heckler,

739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

Id. at 1322.

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. Singh, 222 F.3d at 451. A treating physician's opinion concerning a claimant's impairment will be granted controlling weight, if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. Id. While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that an opinion "do[es] not automatically control, since the record must be evaluated as a whole." Prosch v. Apfel, 201 F.3d at 1013.

The Eighth Circuit has upheld an ALJ's decision to discount or disregard the opinion of a treating physician in situations in which other medical assessments "'are supported by better or more thorough medical evidence'" or in which a treating physician gives inconsistent opinions that undermine the credibility of the opinions. Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)). In any

event, whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations require the ALJ to "always give good reasons" for the particular weight the ALJ chooses to give the opinion.  <u>Singh</u>, 222 F.3d at 452; <u>Prosch</u>, 201 F.3d at 1013; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

## The ALJ's Findings

ALJ Mills found that Nasser successfully met his burden as to the first two steps of the five-step procedure outlined in 20 C.F.R. § 404.1520(a)(4): Nasser had not been engaged in substantial gainful activity since the alleged onset of disability; and his varicocele, hernia operations, degenerative disc disease, and right foot cheilectomy were "severe" impairments based on the requirements in 20 C.F.R. § 404.1520(c).  ALJ Mills determined that Nasser's medically determinable impairments, however, did not equal or exceed one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  ALJ Mills then considered whether Nasser was capable of performing his past relevant work.

After considering all of the evidence in the record, ALJ Mills concluded that Nasser had failed to demonstrate that he was incapable of performing his past relevant work, and therefore Nasser was not disabled.  ALJ Mills found that Nasser's allegations regarding the severity of the pain in and around his left hip were not credible for several reasons.  First, none of Nasser's treating physicians

opined that Nasser was disabled or that his medications produced significant side effects.  Second, the record indicated that Nasser had worked for several years with his medically determinable impairments.  Third, the record failed to indicate any discernible change in Nasser's condition between the period in which he was able to work and the period after his termination.  Fourth, ALJ Mills noted that Nasser generally avoided treatment, other than medication, to relieve his symptoms.  Finally, ALJ Mills relied on Nasser's daily actions in and around his house as well as the state's residual functional capacity assessment to conclude that Nasser's pain would not prevent him from performing the sedentary position of computer programmer.

## Discussion

Nasser contends that ALJ Mills' decision is not based on substantial evidence because the ALJ failed to adequately consider and apply the Polaski factors when discrediting Nasser's subjective complaints of pain.  Additionally, Nasser maintains that the ALJ's consideration of Nasser's residual functional capacity was flawed, as it was based entirely on an RFC assessment that was not performed in accordance with the procedures established in 20 C.F.R. § 404.1546.  Finally, Nasser argues that ALJ Mills made numerous statements in his decision that are not supported by the facts in the record.

After reviewing the entirety of the record, I believe there is substantial evidence to support ALJ Mills' decision that Nasser has the residual functional capacity to resume computer programming work and is therefore not disabled. At the outset, it must be noted that the nature and legitimacy of Nasser's impairments have never been in dispute. Indeed, ALJ Mills acknowledged that the record clearly attributed the pain in and around Nasser's left hip to several medically diagnosed conditions including recurrent left inguinal hernia, a large varicocele running the length of the left testicle, and degenerative disc disease in the lower spine. According to ALJ Mills, however, Nasser failed to meet his burden of demonstrating that these impairments render him incapable of returning to his work as a computer programmer.

As ALJ Mills correctly concluded, the initial burden rests on a claimant to demonstrate that he or she is not able to do past relevant work. Eichelberger, 390 F.3d at 591. "Only when the claimant establishes the inability to do past relevant work does the burden shift to the Commissioner." Id. The primary issue presented in this appeal is whether ALJ Mills' decision that Nasser had not met his burden was supported by substantial evidence. For the following reasons, I find that it was.

The only evidence in the record supporting Nasser's claim that his pain prevented him from returning to work as a computer programmer is Nasser's own

subjective complaints of pain.  The record is noticeably void of any medical evidence which establishes that Nasser's physical impairments prevent him from doing his past relevant work.  Eichelberger, 390 F.3d at 591 (upholding ALJ's finding of no disability where no physician had placed a significant limitation on the claimant's work activities).  Cf. Nevland v. Apfel, 204 F.3d 853, 857-58 (8th Cir. 2000) (finding that claimant had met his burden by producing medical evidence which established that he suffered from medically determinable impairments which prevent him from performing his past relevant work).  While an ALJ may not discount a claimant's subjective complaints on the sole ground that those complaints are not fully supported by the objective medical evidence, Jeffrey v. Secretary of Health & Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988), an ALJ may disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998); Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997); Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990).  Thus, in assessing subjective allegations, the ALJ may consider the frequency and type of the claimant's medication or treatment, the claimant's daily activities, and the claimant's appearance and demeanor at the hearing.  Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); Cruse v. Bowen, 867 F.2d 1183, 1186 (8th Cir. 1989).

When rejecting a claimant's subjective complaints, the ALJ must make an express credibility determination using the factors set forth in Polaski. Baker v. Apfel, 159 F.3d 1140, 1144 (8th Cir. 1998); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered the relevant evidence. Jeffrey, 849 F.2d at 1132; Butler v. Secretary of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

ALJ Mills properly followed the Polaski requirements. He found many aspects of Nasser's testimony not credible, and he explicitly discredited Nasser's testimony and gave his supporting reasons therefore. First, ALJ Mills relied on the fact that none of Nasser numerous treating physicians testified or otherwise concluded that he was disabled. In fact, several statements from Nasser's treating physicians could reasonably be viewed as undermining the extent of Nasser's subjective complaints of pain. Dr. Philip George stated that Nasser's degenerative disc disease findings were mild, and were not symptomatic enough to take medications. Dr. Hawatmeh noted that after Nasser's second hernia repair, Nasser requested "lots of Vicodin" to ease the pain associated with walking even though Dr. Hawatmeh thought Nasser looked to be ambulating just fine.

Second, ALJ Mills reasoned that the fact that Nasser had previously been able to work with his medically determinable impairments eroded his credibility. Generally, if a claimant has worked with an impairment for a period of years, it cannot be considered presently disabling.  See, e.g., Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (substantial evidence supported Secretary's decision that claimant was not disabled where claimant continued working as a barber for eleven years after her doctor had concluded that she not capable of performing any meaningful gainful employment because of her low back pain).  In this case, Nasser testified that he worked for several years while experiencing pain from his varicocele and recurrent left hernia.  Nasser stated in his first hearing that he had pain from his varicocele since the 1980's, but that it wasn't debilitating until the 1990's.  He claimed that the pain "got lots worse" prior to his 1996 hernia operation. He testified that he had a lot of pain after this first hernia operation.  Despite the alleged severity of this pain, Nasser worked for another five years before he considered himself incapable of work on September 7, 2001.

As Nasser explained, he "just winked and endured the pain" prior to his termination.  Yet Nasser failed to offer an explanation as to why he could wink and endure his pain prior to September 7, 2001, but could not similarly tolerate his impairments after that date.  Nasser claimed that his termination supports his

contention that he can no longer competently perform his computer programming assignments. Nasser's own testimony, however, undermines this assertion. As he acknowledged in his first hearing, the stated reason for his termination was not his lack of concentration or general incompetence, but rather was the fact that his predecessor had returned to the company. Thus, a reasonable person could conclude that the circumstances surrounding Nasser's termination fail to demonstrate that Nasser could no longer work.

Third, ALJ Mills relied on Nasser's own statements about what he could and could not do to discount the severity of his subjective complaints of pain. In the hearing, ALJ Mills learned from Nasser that Nasser could drive his car, maintain his own yard, shop for groceries, walk five to ten minutes without much difficulty. Nasser testified that he had no problems with his grip, or the movement and use of his hands. Although he owned a cane, he did not use it. His hobbies included fishing and wood-working. He further testified that he is able to operate his personal computer, which he uses to correspond with friends, participate in discussion groups, and prepare the detailed statements that he submitted throughout this case. Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations."). Additionally, ALJ Mills found that Nasser's testimony as well as the

reports he submitted for consideration were evidence that Nasser was capable of concentrating and performing highly detailed work tasks.

Fourth, ALJ Mills noted that Nasser has "generally avoided treatment, other than medication, for symptom relief." While I may not entirely agree with the statement that Nasser has "generally avoided treatment," I do find that a reasonable person could conclude that Nasser's aversion to certain treatments was inconsistent with his subjective complaints of pain. For example, Dr. Coleman twice recommended to Nasser that he undergo a left femoral nerve block to ease his pain. Nasser elected not to pursue this nerve block, based on his own appraisal of its potential effectiveness. Similarly, in July, 2004, Dr. Smith recommended that Nasser repair his recurrent left hernia. Dr. Smith believed that the procedure could improve Nasser's pain significantly. Again, there is no record that Nasser elected to undergo this procedure. A reasonable person could conclude that Nasser's decision to hold off on both of these procedures is not consistent with his subjective complaints of debilitating pain.

In sum, when viewed as a whole, there are numerous grounds on which a reasonable person could conclude that Nasser failed to meet his burden of demonstrating that he could no longer perform his past relevant work. ALJ Mills did not rely solely on the lack of objective evidence of Nasser's pain. Rather, ALJ

Mills applied the <u>Polaski</u> factors to determine that Nasser' subjective complaints of pain were not credible. Accordingly, I find that ALJ Mills' determination of no disability is supported by substantial evidence in the record and should therefore be upheld.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of September, 2006.